IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

GULF COAST PHARMACEUTICALS PLUS          PLAINTIFF

v.                        CIVIL NO. <u> 1:22cv263 LG-BWR </u>

THE UNITED STATES OF AMERICA            DEFENDANT

**PETITION FOR RETURN OF ILLEGALLY SEIZED PROPERTY**
**<u>PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)</u>**

> The effect of the 4th Amendment is to put the courts of the United States and federal officials, in the exercise of their power and authority, under limitations and restraints as to the exercise of such power and authority, and to forever secure the people, their persons, houses, papers, and effects against all unreasonable searches and seizures under the guise of law. This protection reaches all alike, whether accused of crime or not, and the duty of giving to it force and effect is obligatory upon all intrusted [sic] under our Federal system with the enforcement of the laws.

*Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985), *citing Weeks v. United States,* 232

U.S. 383, 391-92 (1914).

Movant, Gulf Coast Pharmaceuticals Plus, LLC ("GCPP" or "Movant") brings

this petition pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure seeking

the return of all property that was illegally seized from its premises by the United States

and its agents. This is because virtually all of the papers and electronic data searched,

seized and retained pursuant to the first search warrant exceeded the temporal scope

(December 1, 2019 through April 15, 2020) and the subject matter scope (evidence of a

violation of the DPA) of the first search warrant.  Of those papers that fell within the temporal and subject matter scopes, all of the papers created prior to March 30, 2020 must be returned to GCPP because the magistrate could not have been left with a "substantial basis" upon which to believe probable cause existed that a violation of the Defense Production Act ("DPA") had occurred prior to March 30, 2020, the first day the government published the list of "designated scarce materials" in the Federal Register. All of the papers and electronic data searched and seized pursuant to the second search warrant must be returned to GCPP because the second search warrant was executed on the aforementioned items that were illegally seized and retained because they were either outside the temporal and subject matter scope of the first warrant, or could not have been evidence of a violation of the DPA because they were created before March 30, 2020. These papers were illegally retained by the government after their initial seizure and any subsequent search of those papers or data is tainted.

I.   APPLICABLE LAW

   a.   Federal Rule of Criminal Procedure 41

   Federal Rule of Criminal Procedure 41(g) permits an individual who has no other judicial avenue upon which to seek redress for the unlawful search and seizure of his property to petition the court for relief.

   A person aggrieved by an unlawful search and seizure of property
   or by the deprivation of property may move for the property's
   return. The motion must be filed in the district court where the
   property was seized. The court must receive evidence on any factual

2

issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed.R.Crim.P. 41(g).

A motion brought pursuant to Rule 41(g) outside the confines of a criminal case is properly construed as "as a civil complaint under the court's general equity jurisdiction." *Serrano v. Customs and Border Patrol*, 975 F.3d 488, 499 (5th Cir. 2020) (internal citations omitted). "Rule 41(g) provides an additional avenue to challenge the seizure before a neutral decision maker and is 'an action frequently taken to force the government agency to act expeditiously.'" *Id.* citing *Muhammed v. Drug Enf't Agency, Asset Forfeiture Unit*, 92 F.3d 648, 651-52 (8th Cir. 1996). "Once the Court's equity jurisdiction has been recognized, in order to prevail on a motion pursuant to Rule 41[(g)], the plaintiffs must show that (1) they are entitled to lawful possession of the seized records and documents, and (2) the seizure was illegal." *Watts v. Kroczynski*, 636 F.Supp. 792, 796 (W.D. La. June 10, 1986) *citing* Advisory Committee Note, Fed.R.Crim.P. 41, 1972 Amendment.

In 2009, Congress amended subdivision (e)(2) of Rule 41 to address searches of electronic storage media. *See* Advisory Committee Note, Fed.R.Crim.P. 41, 2009 Amendments. Rule 41(e)(2) recognizes that the amount of data contained in "electronic storage media" makes it "impractical for law enforcement to review all of the information during execution of the warrant at the search location." *Id.* The commentary makes it clear that under this circumstance, the police must engage in a "two-step process" to

ensure any electronic items copied that are outside the scope of the warrant are identified and returned to the property owner. *See id.* The second step in that process requires the police to "determine what electronically stored information falls within the scope of the warrant." *Id.* In other words, while the rule recognizes that police may initially seize electronic data that likely falls outside the scope of the warrant, the police are required to subsequently determine what electronic data was not authorized for seizure and to divest itself of possession of that property. Rule 41 does not authorize general searches of electronically stored data or "papers."

### b. The Fourth Amendment

#### i. The Warrant Requirement, General Searches Not Allowed

Absent a recognized exigency, before government agents can enter onto privately owned property and search for evidence of a crime, a neutral magistrate must authorize a search warrant. "[E]xcept in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Michigan v. Tyler,* 436 U.S. 499, 506 (1978). Search warrants cannot be used to conduct general searches. "General warrants of course, are prohibited." *Andresen v. Maryland,* 427 U.S. 463, 480 (1976). Instead, a search warrant must specifically identify the items to be seized. "The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and *the persons*

*or things to be seized.*" *Groh v. Ramirez,* 540 U.S. 551, 557 (2004) (emphasis in original).

"[A] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King,* 563 U.S. 452, 459 (2011). "This requirement 'makes general searches … impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *Andresen,* 427 U.S at 480.

When a warrant is authorized, but it is later determined that probable cause did not exist to establish that some or all of the property identified for seizure would be evidence of the crime identified in the warrant, such a seizure is warrantless. *See Watts* 636 F.Supp. at 802-03. Just like any other warrantless search, the owner of the improvidently seized property has a right to the return of the original and any duplicates of the property improvidently seized. *See id*. This is true even if the government agents acted in good faith reliance on the validity of the warrant. *Id.* at 801-02. (Holding where the agents acted in good faith and did not "flagrantly" violate terms of the warrant, only those items outside the scope or without probable cause must be returned to owner.) A property owner may not be divested of his right to possession of his property simply because government agents incorrectly believed they had the authority to seize it in the first instance. *Id.*

### ii.   Warrantless searches of a business are presumed to be unreasonable.

"Warrantless searches are presumptively unreasonable." *United States v. Villarreal,* 963 F.2d 770, 773 (5th Cir. 1992). "The rule that warrantless searches are generally unreasonable applies to commercial premises as well as homes." *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 308 (1978). Society recognizes that owners, operators and even employees of commercial entities have an objectively reasonable expectation of privacy in records maintained in corporate offices.  "The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id*. at 311. This is true even if employees have access to the premises. "Nor does the fact that an employer by the necessary utilization of employees in his operation mean that he has opened areas where the employees alone are permitted to the warrantless scrutiny of Government agents." *Id.* at 308.

### iii.   There must be a nexus between the crime identified in the warrant and the items authorized for seizure.

To authorize a search warrant, a magistrate must be convinced that there is probable cause to believe the items to be seized specifically identified in the warrant will be evidence that a specific criminal offense has been committed. "A police officer seeking the issuance of a search warrant must present an affidavit containing facts sufficient to 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Kohler v. Englade,* 470 F.3d 1104, 1109 (5th Cir. 2006) *citing*

6

*Illinois v. Gates*, 462 U.S. 213, 239 (1983). The affidavit must establish that the items sought to be seized are connected to the crime that is identified in the warrant. "The officer's supporting affidavit must make it apparent, therefore, that there is some nexus between the items to be seized *and the criminal activity being investigated.*" *Id.* (emphasis added).

### iv.   Only items within the scope of the warrant may be seized.

The scope of what can be searched is "limited by the terms of [the] authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). When government agents seize and retain items that are not authorized for seizure by the warrant, they have conducted a warrantless search, and the seizure and retention of those items is unconstitutional. "If the scope of the search exceeds that permitted by the terms of a validly issued warrant … the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 140 (1990). In that circumstance, the owner of the improvidently seized property is entitled to the return of the original and all duplicates of the property. *See* Fed.R.Crim.P. 41(g), *see also Watts* 636 F.Supp. at 802-03. This is so even if the owner of the property is a corporation and not an individual. "Nor does it make any difference that the property seized and the premises searched in this case were owned by a corporation rather than an individual. Since a corporation has the same rights as a natural person to be free from illegal searches and seizures…" *Henzel v.*

*United States,* 296 F.2d 650, 652 (5th Cir. 1961), *citing Silverthorne Lumber Co. v. United States,* 251 U.S. 385 (1920).

> **v.  The Third Party Doctrine does not apply to searches conducted at the direction of the government.**

As a general proposition, a search conducted "by a private individual ***not*** *acting as an agent of the Government or with the participation or knowledge of any government official"* does not implicate the Fourth Amendment. *United States v. Jacobsen,* 466 U.S. 109, 113-14 (1984) (emphasis added), citing *Walter v. United States,* 447 U.S. 649, 662 (1980); see also *United States v. Pierce ("Pierce I"),* 893 F.2d 669, 673 (5th Cir. 1990); *Coolidge v. New Hampshire,* 403 U.S. 443, 487 (1971). "Only activity by government agents implicates a person's Fourth Amendment rights." *United Sates v. Barth,* 26 F.Supp.2d 929, 935 (W.D. Texas, Sept. 21, 1998), *citing United States v. Paige,* 136 F.3d 1012, 1017 (5th Cir. 1998). When a third party conducts a search or otherwise discloses evidence to the government, government agents may ***subsequently*** duplicate the search disclosed and conducted by the private, third party. "[A] ***prior*** private-party search of an area ordinarily frustrates one's expectation of privacy therein, such that a ***subsequent*** police search, ***limited in scope to the private-party search***, does not cause us much concern." *Paige,* 136 F.3d at 1020 (emphasis added).

However, when a private third party conducts a search in the first instance for the purpose of "assisting law enforcement officials" and with the knowledge or acquiescence of the government, the search triggers the protections of the Fourth

Amendment. "For a private party search to be classified as government action, (1) the government must know of or acquiesce in the intrusive conduct, and (2) the private party must intend to assist law enforcement in conducting the search." *Barth,* 26 F.Supp.2d at 935, *citing Paige* 136 F.3d at 1017. In this regard, the timing of the government involvement is critical. A search or seizure conducted by the private third party *subsequent to* government involvement, knowledge or acquiescence makes the private third party a government actor. *See Barth,* 26 F.Supp.2d at 937. A private, third-party search only destroys "an individual's reasonable expectation of privacy …. where the **subsequent** police search is limited in scope to the private party's search." *Id., citing United States v. Bomengo,* 580 F.2d 173, 175-76 (5th Cir. 1978) (emphasis added). The Fifth Circuit applies this standard by asking whether "the government knew of or acquiesced in the intrusive conduct of [the private person]." *Paige,* 136 F.3d at 1017. Rewarding a private citizen for assisting the government in a criminal prosecution is proof of government "knowledge-and-acquiescence." *United States v. Thompson,* 2017 WL 6325818, * 16 (E.D. La. Dec. 11, 2017), citing *United States v. Walther,* 652 F.2d 788, 793 (9th Cir. 1981).

      **vi.   The government cannot use knowledge it obtained illegally to cure the Fourth Amendment violation.**

The government cannot make use of, or benefit from, the illegal possession of evidence. "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that

it shall not be used at all." *Silverthorne Lumber Co.,* 251 U.S. at 392. The government cannot use or benefit from the knowledge it gained from its wrong conduct in obtaining evidence. *See id.* In *Silverthorn Lumber,* the government executed a warrantless search of the Silverthorn Lumber offices, collecting incriminating evidence in the process. *Id.* at 390. To remedy the Fourth Amendment violation, the government issued a grand jury subpoena to Silverthorn for the same records. The Supreme Court described the government's attempt to do an end run around the Fourth Amendment violation:

> The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act.

*Id.* at 392. The Supreme Court rejected the government's argument that the issuance of the grand jury subpoena cured the illegal search. "In our opinion such is not the law. It reduces the Fourth Amendment to a form of words." *Id.* This must be the result even if the government could have obtained a search warrant based on probable cause. "[T]he rights of a corporation against unlawful search and seizure are to be protected even if the same result might have been achieved in a lawful way." *Id.*

## II.   PROCEDURAL HISTORY

### a.   The "First Warrant"

The government sought and received a search warrant (hereinafter referred to as the "First Warrant") to search the premises of GCPP on April 15, 2020. *See* April 15, 2020 Search Warrant, attached as Exhibit "A." The warrant alleged there was probable cause to believe that a single federal law had been violated – the DPA. *Id.* at 4. The warrant was limited in temporal scope to "[a]ll items relating to violations of the statutes listed on the warrant whether printed or electronic format *for the period of December 1, 2019, through and including the present…*". *Id.* The warrant was authorized by the Court on April 15, 2020.

### b.   The "Second Warrant"

On August 18, 2021 the government sought and received a warrant (hereinafter referred to as the "Second Warrant") to search all of the electronic data it had previously seized from GCPP on April 17, 2020. *See* August 18, 2020 Search Warrant and Application, attached as Exhibit "B". The warrant describes the property to be searched as "[t]he TARGET DEVICES [that] were originally imaged at the GCPP premises pursuant to a Federal search warrant, executed on April 17, 2020." Ex. "B" at 2, 34. The Second Warrant was premised on alleged criminal violations that are separate and distinct from the DPA violation that was the sole basis of the First Warrant. "The

investigation to date has revealed that, in addition to other scheme for which the owner[1]

and operator of GCPP is being prosecuted …, from approximately August 2014 to

present, GCPP, and individuals associated with GCPP, engaged in ***an unlawful invoice***

***backdating scheme***…" Ex. "B" at 3. The government has taken the position that the

backdating scheme and the PPE scheme identified in the First Warrant as a DPA

violation are separate and distinct investigations and offenses.

> ***There can be no doubt that the offenses charged relating to the PPE Scheme
> are "different" than those charged relating to the Backdating Scheme. The
> victims are different***, as in the PPE Scheme, the victims are various VA
> facilities and private hospital systems, whereas the victims in the
> Backdating Scheme are health care benefit programs. ***Different witnesses
> will testify in support of each scheme.*** For example, program witnesses for
> the health care benefit programs will testify with regard to the Backdating
> Scheme and VA representatives will testify with regard to the PPE Scheme.
> ***The exhibits introduced at trial as to each scheme will also be different***, as
> the backdated invoices and purchase records of the Sil-K Pads and Scarsilk
> Gel are not relevant to the PPE Scheme but are relevant to the Backdating
> Scheme. Similarly, the PPE purchase and sale records are not relevant to the
> Backdating Scheme but are relevant to the PPE Scheme.

*See United States v. Kenneth Bryan Ritchey,* Criminal No. 1:21-cr-6-HSO-RPM, [ECF No.

98  at 9] (emphasis added). Similarly, the Court in that case has determined that the

factual allegations supporting these two, distinct schemes "do not overlap." *Id.* [ECF

No. 108 at 18.]

---

[1] The owner of GCPP, Debra Ritchey, has never been charged with a crime.

### III.   THE FIRST SEARCH WARRANT DID NOT ESTABLISH PROBABLE CAUSE THAT A VIOLATION OF THE DPA OCCURRED PRIOR TO MARCH 30, 2020 OR THAT DOCUMENTS CREATED PRIOR TO THAT DATE WERE EVIDENCE OF A VIOLATION OF THE DPA.

The April 15, 2020 "first" search warrant was not supported by adequate probable cause to justify allowing the government to search for and seize items that were created before March 30, 2020. The First Warrant authorized seizure of materials created during a five-month period – from December 1, 2019 to April 15, 2020 – related to an alleged violation of the Defense Production Act ("DPA"), 50 U.S.C. §§ 4512 and 4513 (hoarding of designated scarce materials). The application and the actual the warrant cited only to the DPA, and did not allege probable cause that evidence of any other violation of law would be found at the premises to be searched. *See* Ex. "A" at 4.[2] There was, however, no way that probable cause could have existed that Sections 4512 and 4513 had been violated prior to March 30, 2020. This is because Sections 4512 and 4513, while making the hoarding of designated scarce materials a crime, explicitly states that "scarce materials" are only those materials that the President so defines and publishes in the Federal Register. *See* 50 U.S.C. §4512 "In order to prevent hoarding, no person shall accumulate… **_materials which have been designated by the President_** as scarce materials or materials the supply of which would be threatened by such accumulation. **_The President shall order published in the Federal Register_**, and in such other manner as he may deem

---

[2] Page numbers in the citation refer the page number identified at the top of the page, as identified by the CM/ECF system. To the extent exhibits have page numbers included from their original drafting, those numbers are not referenced in the citations in this pleading.

appropriate, ***every designation of materials the accumulation of which is unlawful***…"
*Id.* (emphasis added). Until specific "scarce materials" are identified by being published in the Federal Register, it is impossible for a person to willfully and knowingly violate the criminal provision of the DPA, or to conspire to violate the DPA. It is critical to note that a criminal violation of the DPA must be done "willfully." *See* 50 USC § 4513. To do an act "willfully … means that the act was committed voluntarily and purposely, with the specific intent to do something t***he law forbids***; that is to say, with bad purpose either ***to disobey or disregard the law***." Fifth Circuit Pattern Jury Instruction 1.38 (emphasis added).

On March 30, 2020, the Department of Health and Human Services published its Notice in the Federal Register designating "health and medical resources necessary to respond to the spread of Coronavirus Disease 2019 (COVID-19)" as scarce materials "subject to the hoarding prevention measures" of Section 4512. In other words, until March 30, 2020, all of the items alleged to have been hoarded in the superseding indictment had *not identified as scarce materials* under Section 4512 and any alleged "hoarding" of the materials *was not a crime* prior to that day. Accordingly, any warrant seeking evidence of criminally hoarding COVID-19 related designated scarce materials from December 1, 2019 to March 29, 2020 cannot be supported by probable cause that the DPA had been willfully violated during that time frame. Likewise, it is impossible for documents, records or any other type of "evidence" that was created prior to March

30, 2020 to relate to or involve a willful violation of the DPA. More simply put, there could not have been probable cause that the search or seizure of documents or records that were created prior to March 30, 2020 would reveal evidence of an act that was not criminalized until March 30, 2020. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983) (noting that a warrant must show probable cause that contraband or evidence of a crime will be found in a particular place).

No one could have formulated a willful intent or design to violate the DPA by hoarding PPE until March 30, 2020 when -for the first time – PPE was identified as a scare material subject to the criminal provision of the DPA. It follows that it was impossible for the court to find probable cause to believe that evidence of a violation of the DPA could have been created *prior to* March 30, 2020 – the first day hoarding PPE became a violation of the DPA. As such, any papers or evidence – electronic or otherwise – seized by the government that were created before March 30, 2020 were seized without probable cause and all originals and copies in the possession of the government must be destroyed or returned to GCPP.

The same is true for all records seized and retained that were created after April 15, 2020. The warrant clearly limited the outer time frame of its scope to "the present." Ex. "A" at 4. The warrant was presented to and signed by the magistrate on April 15, 2020. The only date that could be construed as "the present" would be the same date the warrant was presented to and signed by the magistrate. As such, any papers or

evidence – electronic or otherwise – seized by the government that were created after

April 15, 2020 were illegally seized and all originals and copies in the possession of the

government must be destroyed or returned to GCPP.

## IV.   THE GOVERNMENT EXCEEDED THE TEMPORAL SCOPE PERMITTED BY THE FIRST SEARCH WARRANT, FAILED TO COMPLY WITH THE TWO-STEP PROCESS OF RULE 41 AND ILLEGALLY RETAINED PROPERTY NOT COVERED BY THAT WARRANT FOR MORE THAN A YEAR.

After the initial seizure of papers and digital data on April 17, 2020, the

government did not undertake an effort to identify and delete papers or electronic data

that did not fall within the temporal scope authorized by the First Warrant. Instead, the

Government illegally retained material that the First Warrant did not authorize it to

keep for the purpose of executing a second, unrelated search warrant over a year later.

The Court approved the Government's requested date range in the First Warrant

(December 1, 2019 to April 25, 2020), which limited the scope of items it could seize and

keep pursuant to its execution of the First Warrant. The Government has admitted that

"in August 2021, an expanded search and seizure warrant was signed, authorizing the

prosecution team to conduct additional searches of the ***same*** Seized Digital Material,

with an expanded date scope covering August 31, 2014 through April 17, 2020." *See*

*United States v. Kenneth Bryan Ritchey,* Criminal No. 1:21-cr-6-HSO-RPM, [ECF No. 81 at

p. 3] (emphasis added). In other words, the Government had retained for over a year,

and with no legal authority to do so, the possession of documents and electronic data

seized during the execution of the First Warrant that go as far back as at least 2014 – five

years outside the scope of the First Warrant. *See id.* [ECF No. 76-3] (describing the Target Devices to be searched, which were "originally imaged at the GCPP premises pursuant to a Federal Search warrant, executed on April 17, 2020" and contained information relevant to the August 18, 2021 search warrant from "August 31, 2014, through the date of collection on April 17, 2020."). Without compunction, the government has admitted it violated Rule 41 and exceeded the scope of the First Warrant.

There is no explanation for the Government's 16 month-long unlawful retention of seized evidence that is as much as five years outside of the scope of the First Warrant, especially as the Government admits that it has the ability to "date-scope" documents. *See United States v. Kenneth Bryan Ritchey, Criminal No. 1:21-cr-6-HSO-RPM,* [ECF No. 72-3] ("The filter team has only provided to the prosecution team ***date-scoped*** non-potentially protected material from the search warrant executed at 955 North Halstead Rd."). The Government's first order of business should have been to segregate *all* documents that were outside the time frame described in the First Warrant and immediately return those documents to GCPP and to delete all electronic copies of those documents.   The government cannot now utilize this illegally seized and retained evidence in Court. *See Silverthorne Lumber Co.,* 251 U.S. at 392. Illegally acquired evidence "shall not be used before the Court" or in any other way "at all." *Id.*

V.     **THE GOVERNMENT EXECUTED WARRANTLESS SEARCHES OF GCPP COMPUTERS AND PROPERTY THROUGH ITS AGENTS AT A TIME WHEN GCPP HAD A REASONABLE EXPECTATION OF PRIVACY FROM A GOVERNMENT SEARCH.[3]**

Over the course of most of 2021, federal agents and prosecutors interviewed several GCPP employees and contractors about their knowledge of the purported backdating of certain invoices, as detailed in counts one and two of the superseding indictment pending in *United States v. Kenneth Bryan Ritchey*, Criminal No. 1:21-cr-6-HSO-RPM. *See* Ex. "C" at 109.  Many of these witnesses are identified in the superseding indictment as unindicted co-conspirators. *See United States v. Kenneth Bryan Ritchey, Criminal No. 1:21-cr-6-HSO-RPM,* [ECF No. 34]. Each of these witnesses are targets of the government's investigation, and each are undoubtedly working with the government to curry favor during the plea negotiation process. Co-Conspirator 3, Brandon Reich, entered a plea of guilty on July 27, 2022 related to his role in the alleged PPE scheme in *United States v. Brandon J. Reich,* Criminal No. 1:22-cr-73-HSO-BWR. [ECF No. 15].

During the course of these interviews, several of these co-conspirators, including Reich, denied having knowledge of invoice backdating. *See* Ex. "C" at 11, 29-30.  They made clear to the prosecution team that any such evidence, if it existed, would

---

[3] The factual representations included in this section are taken from ECF document numbers 44, 45, 49 and 56, filed in *United States v. Kenneth Bryan Ritchey*, Criminal No. 1:21-cr-6-HSO-RPM, as well as from the transcript of the hearing on a motion to suppress in that same criminal matter. That transcript is attached to this pleading as Exhibit "C".

potentially be found in various electronic databases maintained by GCPP. As part of the interviews, federal agents affirmatively asked the respective unindicted co-conspirators to assist the government in furthering its investigation into the invoice backdating case by looking for and providing to investigators any additional evidence that they found. *See id* at 11-13, 29-30. As a result of the government's request, and for the purpose of assisting the government in its investigation, these co-conspirators searched the private computer databases maintained by GCPP and provided federal agents and prosecutors with detailed reports of the information contained within those databases, as well as actual copies of records the co-conspirators obtained from those databases. *See id.*

Subsequent to these warrantless searches, the government sought and obtained a superseding indictment which added charges based on the evidence seized by the unindicted co-conspirators. The government also obtained the Second Warrant, based in some part on the evidence at issue in this motion, permitting it to re-search all of the evidence seized from GCPP during the execution of the First Warrant. At the time of the warrantless searches, GCPP had put into place safeguards and access controls on the electronic databases sufficient to establish that it had an objectively recognized expectation of privacy against a warrantless government intrusion into the records contained within GCPP's electronic databases. *See* Ex. "C" at 69-74.

a.    **GCPP had a justifiable expectation of privacy in the evidence seized.**

"[C]apacity to claim the protection of the [Fourth] Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 368 (1968). GCPP is the legal entity that owns the property seized and controls the premises searched. *See United States v. Kenneth Bryan Ritchey*, Criminal No. 1:21-cr-6-HSO-RPM, [ECF No. 34]. GCPP had "an actual, subjective expectation of privacy with respect to the place being searched [and] the items being seized." *United States v. Iraheta*, 764 F.3d 455, 461 (5th Cir. 2014). GCPP employed access control and security measures to ensure that only authorized persons could gain access to its facilities. *See* Ex. "C" at 69-74; *see also* Affidavit of Johnathan Wright, attached as Exhibit "D." As part of its operations, GCPP utilized multiple electronic record keeping systems, including a program called Fishbowl and a program called QuickBooks. Ex. "C" at 66, 70; Ex. "D." Access to these programs was limited to certain persons that had an explicit business need for the proprietary records maintained with these programs. Ex. "C" at 66-72; Ex. "D." These databases, as well as the computers used to access them, were password protected. Ex. "C" at 64-66, 70; Ex. "D." To gain access to the pertinent databases, employees were required to input as many as four different passwords. Ex. "C" at 32. GCPP's servers and on-site computers were maintained behind locked doors, in a facility secured by an alarm system. *See* Ex. "D." GCPP

20

contractors and employees who had access to GCPP's computer systems signed written

agreements that acknowledged significant limitations of the permissible uses of their

access to GCPP's computer systems and databases. *See* Ex. "C" at 8-11, 25-28, *see also*

Employment Agreements attached as Exhibits "E, F, G, H & I."

    **b.**    **The government knew of and acquiesced in the intrusive conduct.**

In this case, government agents interviewed multiple unindicted co-conspirators,

each of which, upon information and belief, have been approached by the government

and offered cooperating plea agreements. *See* Redacted FBI 302 reports describing

proffer interviews of Brandon Reich and J.M., attached as Exhibits "J, K, L, M & N."[4]

During the course of these interviews, the unindicted co-conspirators were asked about

the allegations of invoice backdating. *See* Ex. "J, K, L, M & N." During each respective

interview, federal agents asked each unindicted co-conspirator to assist in furthering

the investigation by agreeing to "do further research on this topic and provide Agents

with additional information at a later date." Ex. "J, K, L, M & N." As can be seen from

the FBI 302 reports, the requests for "further research" resulted in the respective

unindicted co-conspirators searching GCPP secured, electronic databases, and

providing copies or descriptions of GCPP documents and emails, as well as

---

[4] These exhibits were taken from the publicly filed motion to suppress in *United States v. Kenneth Bryan Ritchey*, Criminal No. 1:21-cr-6-HSO-RPM, [ECF No. 44, 45].

descriptions of the contents of the electronic databases to the prosecution team. Ex. "J, K, M, & N."

Brandon Reich was interviewed by the prosecution team on March 2, 2021. Ex. "J." During this interview, Reich described GCPP's electronic record keeping systems, Fishbowl and QuickBooks. Ex. "J." The prosecution team asked Reich "to do further research into [invoice backdating] and meet with Agents at a later date." Ex. "J." Reich agreed to do so. Ex. "J". Everything Reich did from this point forward occurred with the knowledge and acquiescence of the government and was done for the purpose of assisting the government.

Reich was again interviewed by the prosecution team on August 3, 2021. *See* Ex. "M." Either prior to or during this interview, Reich provided the prosecution team with a detailed written description of his search of both the Fishbowl and Quickbooks electronic databases, describing evidence Reich characterized as invoice backdating. *See* written description of Reich's searches of GCPP databases, attached as Exhibit "O." Exhibit M makes clear that, since their last meeting, Reich had searched the GCPP electronic databases and exported data from within the GCPP electronic systems, created an Excel spreadsheet of the seized data, and provided that to the prosecution team as well. Later during that interview, Reich was shown an invoice from 2018. Ex. "M." Reich was not familiar with the specific invoice, but, again at the request of the

prosecution team, Reich "agreed to do further research into this invoice to confirm whether it was in-fact [sic] backdated." Ex. M.

Over the course of his cooperation with the government, all occurring after the original request for Reich to assist in furthering the investigation, Reich provided hundreds of records that he obtained by searching GCPP's electronic records for the purpose of retrieving information to assist the government pursue the charges included in the superseding indictment as counts one and two. Specifically, Reich searched the GCPP electronic databases for, and delivered to the prosecution team the invoice described at paragraph 73 of the superseding indictment. *See* invoice attached as Exhibit "P."[5]

Upon information and belief, unindicted co-conspirator M.D. was interviewed on January 27, 2021 pursuant to a proffer agreement that had previously been arranged for by his legal counsel. At this meeting, it is believed that M.D. disclosed that he had stopped working for GCPP during the previous month, December of 2020. Upon information and belief, the government had, prior to M.D. leaving the employ of GCPP, approached M.D. and his legal counsel, seeking his cooperation. As part of this overture, it is normal for the government to request that a potential cooperating witness provide evidence that can potentially assist its investigation. Upon information and

---

[5] Reich searched and seized a number of records that are related to other strands of the investigation that involve conduct that has not been charged. The government instigated warrantless searches of GCPP's private electronic databases by Reich and others was massive and pervasive.

belief, M.D. searched for and obtained a copy of Exhibit P and other records after the initial conversation between his counsel and the government about his cooperation, and for the purpose of providing those records to the government at a later date. During the course of the January 27, 2021 meeting, M.D. provided the government with GCPP documents, specifically the same invoice attached here as Exhibit P. Upon information and belief, M.D. searched the GCPP computer databases for this document in anticipation of meeting with FBI for the purpose of cooperating and assisting the government in its investigation into GCPP and Ken Ritchey.

Unindicted co-conspirator J.M. was interviewed at GCPP on April 17, 2020, contemporaneously with the execution of the first search warrant. *See* HHS-OIG Report of Interview, attached as Exhibit "L." J.M. later met with the prosecution team on July 19, 2021. Ex. "M." During that interview, ***J.M. denied knowing any specific details about the alleged backdating scheme***. Ex. M. Agents asked J.M., whom the Agents knew worked at GCPP and had access to GCPP's secured electronic database, to "do further research on [the backdating] topic and provide Agents with additional information at a later date." Ex. M, *see also* affidavit to the first search warrant, Ex. "A." Because of the previous interview with Reich, the prosecution team was already aware that J.M. would need to search the Fishbowl and QuickBooks electronic data systems to conduct this "research." J.M. was interviewed a second time on August 27, 2021, wherein J.M.

described searching GCPP's QuickBooks system "in order to identify backdated invoices." Ex. "N."

### c. The co-conspirators intended to assist law enforcement.

It is clear that Reich, J.M., M.D. and likely others, were encouraged by the prosecution team to search for evidence inside GCPP's premises that could be used to bring the charges in counts one and two of the superseding indictment. It is also clear that when each of these people searched GCPP's private electronic databases they "intended to assist law enforcement." *Paige,* 136 F.3d at 1017. It is axiomatic that, absent the ability to provide information that would "substantially assist"[6] law enforcement in its prosecution of a criminal case, neither Reich, J.M., nor M.D. would be rewarded for their cooperation. In fact, entering into a confidential agreement with law enforcement that expressly states a private party must act in a way that provides substantial assistance to law enforcement in order to be considered for the reward of leniency is conclusive proof of a private party's intent to assist law enforcement. *Thompson,* at *18.

### d. The third party doctrine does not apply.

Both Brandon Reich and J.M. admitted during a suppression hearing that the searches they conducted were done at the request of the government and were for the purpose of assisting the government. Moreover, Reich and J.M. admitted that, prior to

---

[6] The terms "substantially assist" and "substantial assistance" come from the standard cooperating plea agreements and proffer letters used by the government, as well as Section 5k1 of the United States Sentencing Guidelines Manual.

conducting the searches requested by the government, they were unaware of the existence of Exhibit P and other related documents. J.M. testified that he had no idea whether documents reflecting backdating might have existed before he conducted the search at the request of the government.

> Q: Now, at some point there came a time when some folks from the government asked you to do some searches into the computer systems there at Gulf Coast; is that right?
> A: Yes, sir.
> Q: … They asked you about some specific subjects that they wanted you to help investigate; is that right?
> A: Yes, sir.
> Q: And I think your initial response was that you would need to go and search for those items because you weren't sure if they were there or not?
> A: Yes, sir.
> Q: … And so they weren't asking you or you weren't searching for items that you already knew existed, were you?
> A: Yes, sir.
> Q: You did know they existed or you –
> A: No, you are correct in your statement.

Ex. "C" at 11-12. Reich testified similarly.

> Q: Now, at some point you had a conversation with some people from the government, and they asked you to conduct some searches for some information inside Gulf Coast computer systems, right?
> A: Not exactly.
> Q: Okay. Tell me exactly what it was that was asked of you.
> A: Once I was shown proof of an illegality, I offered to assist the government.
> Q: Okay. And what is it that you offered to do? What did you tell them you were going to do?
> A: I would look into backdating to see if it's ever happened before.

Q: … At the time you told them you were going to do that, you had not yet conducted any searches for that type of information, had you?

A: That is correct.

Q: And in fact, your initial response when the government asked you about backdating was that you didn't know anything about that; is that right?

A: That is correct.

        …

Q: So it's fair to say that the information you searched for and ultimately gave the government was information you hadn't seen before?

A: I had seen it in the meeting when they provided the proof to me.

Q: From the government?

A: Correct.

Q: But not during the course of your job?

A: Correct.

Q: So this was not a situation where you affirmatively went to the government and said, hey, I've seen something, you need to know about it?

A: That is correct.

Ex. "C" at 28-30.

Reich, J.M. and M.D. were all acting as government agents when they searched GCPP's secured computer system and copied records, like Exhibit P. Once the government knows that an individual is acting for the purpose of assisting law enforcement, the Fourth Amendment applies to the conduct of the private, third-party. *See Barth*, 26 F.Supp.2d at 936, *see also Jarman*, 61 F.Supp.3d at 604. The government acquiesced to the investigative actions of Reich, J.M. and M.D. It cannot avoid the consequences of their warrantless searches under the Fourth Amendment.

Barth was a CPA that used a computer to conduct his business. *Id.* at 932. Barth began experiencing problems with his computer operating slowly, which he attributed to the presence of a computer virus. *Id.* Barth voluntarily called Kellar, a computer repair person, and engaged Kellar to "fix the problem." *Id.* Kellar picked up the "hard drive portion of the computer" and Barth told him the computer needed to be fixed and returned by the morning. *Id.* During the course of opening files to try and locate a virus, Kellar discovered a single picture of child pornography. *Id.* Kellar immediately called law enforcement to report what he had discovered. *Id.* Kellar, it turned out, was a confidential informant for the FBI, although not related to any investigation into Barth. *Id.* After trying unsuccessfully to contact his supervising Special Agent ("SA"), Kellar called the local police department. *Id.* Kellar was directed by the local police to bring the hard drive to the police station the next morning. *Id.* Subsequently, Keller spoke to his FBI SA, who told "Kellar to copy all of the files on the hard drive onto disks and that she would have someone pick up the disks in the morning." *Id.* After his call with the FBI SA Kellar then reactivated the hard drive and began searching the machine for more child pornography, which he found. *Id.* at 932-33.

The next day, Kellar delivered the hard drive to the local police. *Barth*, 26 F.Supp.2d at 933. The police and Kellar activated the hard drive and viewed the child pornography. *Id.* The local police officers copied the hard drive. *Id.* Local police obtained a search warrant for the hard drive, based on Kellar's sworn affidavit. *Id.* The

warrant was executed the next day. *Id.* The FBI then obtained federal search warrants for Barth's home and his office. *Id.* at 934. The search of Barth's office turned up additional child pornography. *Id.* Barth was subsequently arrested. *Id.* at 935. A motion to suppress followed. *Id.*

The court held that Kellar's discovery of the single, initial image of child pornography was a private search, and that the discovery was made during Kellar's efforts to repair the hard drive, and not for the purpose of assisting the government. *Barth,* 26 F.Supp.2d at 936-37. Notably, this discovery – of a single image – occurred *before* Kellar began communicating with law enforcement about this matter. *See Id.* All of Kellar's searches and activity that occurred *after* he spoke to the local police and his FBI SA, however, were government searches because they were done with the knowledge and acquiescence of law enforcement and by Kellar for the purpose of assisting law enforcement. "Following his conversation with SA Kelly, Kellar opened more files and discovered more incriminating evidence. ***Kellar, at this point, was not opening private files in an effort to repair the machine; he did so for the purpose of assisting law enforcement officials.***" *Id*. at 936 (emphasis added).

The court held that as soon as the government was on notice that Kellar had the hard drive and that Kellar had discovered an image of child pornography, "all actions of Kellar thereafter [were] attributable to the Government." *Id.* The court found that *after* Kellar spoke to his SA supervisor, the government "must be charged with

acquiescing to Kellar's intrusive conduct." *Id.* According to the court, "[t]o draw the line at any later time would give Kellar, untrained in law enforcement and unrestrained by the responsibilities and duties of officers sworn to protect the Constitution, a free reign to violate the protections of the Fourth Amendment while nonetheless working for the Government." *Id*. This was the case, the court reasoned, even though it accepted as a fact that SA Kelly "probably … did not expect Kellar to continue his search of the hard drive." *Id.*

The court also found that Barth did not give up his reasonable expectation to privacy in the files on the hard drive, even though he voluntarily gave Kellar access to the files. "The Court also finds that Defendant did not lose his reasonable expectation of privacy in his closed, individual files when he gave the hard drive to Kellar." *Barth,* 26 F.Supp.2d at 937.  The court held that the third party doctrine permitted the police to view only the single image of pornography that Kellar discovered *prior to*  speaking with SA Kelly about the case. *Id.* The search of the hard drive by the local police, before obtaining the warrant exceeded the permissible scope of the third party doctrine. *See id.*

The court also found that Kellar did not have actual or apparent authority to consent to the search of the computer. *Barth,* 26 F.Supp.2d at 938.

> [T]he authority which justifies the third party consent does
> not rest upon the law of property … but rests rather on the
> mutual use of the property by persons generally having joint
> access or control for most purposes, so that it is reasonable to
> recognize that any of the co-inhabitants has the right to
> permit the inspection in his own right and that the others

> have assumed the risk that one of their number might
> permit the common area to be searched.

*Id., citing United States v. Matlock,* 415 U.S. 164, 171 n. 7 (1970). "The government bears

the burden to show that Kellar had authority to consent to the search." *Id.* Kellar did not

have actual authority to consent because of the limitations placed on his use of the hard

drive by Barth. "Kellar was in possession of the unit for the limited purpose of repair."

*Id.* As such, "it cannot be said that [Barth] assumed the risk that Kellar was in joint

possession of the hard drive such that he could permit a search of it by law

enforcement." *Id.*

The court also found that the local police "could not have reasonably believed

that Kellar had apparent authority to consent to a search of the hard drive." *Barth,* 26

F.Supp.2d at 938. Local police and the FBI were aware that Kellar was a computer repair

technician, "and both were aware of how Kellar came into possession of the hard

drive." *Id.* Moreover, the FBI and the local police were both aware that Kellar "had

possession for the limited purpose of repairing [the hard drive]." *Id.* Based on these

facts, the court found that "neither the FBI nor the [local police] could have reasonably

believed that Kellar had common authority to consent to a search of the hard drive." *Id.*

Even though the local police apparently had probable cause to obtain a search warrant,

"no amount of probable cause can justify a warrantless search or seizure absent exigent

circumstances." *Id, citing United States v. Villarreal,* 963 F.2d 770, 777 (5th Cir. 1992).

In *United States v, Jarman,* the district court in the Middle District of Louisiana applied the same analytical framework as the district court in *Barth*, and found that a computer repair technician, Collins, became a government agent subsequent to his first disclosure to and meeting with the FBI about what he believed to be child pornography on a client's hard drive. 61 F.Supp.3d 598, 604 (M.D. La. Oct. 14, 2014). Similar to *Barth*, the court held that Collins initial discovery of a single file he believed to be child pornography was a private, third-party search that did not implicate the Fourth Amendment. *Jarman,* 61 F.Supp.3d at 604. The court found that once Collins reported his finding to the FBI and subsequently followed FBI instructions to retain the hard drive, he became a government agent for purposes of the Fourth Amendment. "Collins became a government actor *after* his interview with Special Agent Jones on November 26, 2007." *Id.* Since Special Agent Jones asked Collins to "retain possession of the hard drive until another interview could be conducted […] Collins retention of the hard drive was intended to assist law enforcement efforts, as it was done at the request of the Government and not to further Collin's own ends." *Id.*

Reich, J.M. and M.D. did not have actual authority to consent to a government search of GCPP's databases or computers. J.M. testified that he was not permitted to disclose GCPP's information and data without the authorization of GCPP, pursuant to his employment agreement. *See* Ex. "C" at 9-11; *see also* Exs. "E, F." Reich also testified that his employment and independent contractor agreements prohibited him from

32

disclosing confidential information without the express permission GCPP. *See* Ex. "C" at 25-28; *see also* Exs. "G, H."  M.D.'s independent contractor agreement also included the same prohibition on the disclosure of confidential information. *See* Ex. "I." None of these individuals had actual authority to consent to a search of GCPP's records.

The government could not have believed that Reich, J.M. or M.D. had apparent authority to consent to a search of GCPP's electronic databases. J.M. testified that he told the government that he would need to conduct his search in a way that would ensure he did not get caught.

> Q: … So in fact, you expressed some concern to the government that if you conducted this search at a certain time of day, it might slow the system down, and somebody in accounting might be able to detect that you were searching; is that right?
> A: Correct.
> Q: And they said, well, don't do that.
> A: Correct. Well, I don't remember.
> …
> Q: Did you feel like you needed to conduct this search in such a way that Mr. Ritchey or anybody else at the company would not know you were doing it?
> A: Yes, sir.

Ex. "C" at 12.  Reich testified that he actually waited until he was at home, away from the office, before he conducted the searches for Exhibit P and other records.

> Q: When you conducted the searches to assist the government, you said you think you did those while you were at home?
> A: I believe so.
>         …
> Q: But you would agree those searches didn't have anything to do with your buyer's work or the work you were trying to accomplish for the company?

A: Correct.

Ex. "C" at 57-58. The government was aware that M.D. was not a manager or

supervisor and that as a result of his work as an independent contractor, he would not

have had any apparent authority to consent to a search of GCPP's databases or

premises either. Just like in *Barth,* there was no justification for the government to

believe that any of these individuals had the authority to consent to  a search of GCPP's

electronic databases. *See Barth,* 26 F.Supp.2d at 938.

## VI.    CONCLUSION

Movant, GCPP, is entitled to an order declaring that the government exceeded

the facial scope of the First Warrant when it seized and retained records that were

created outside the temporal scope of December 1, 2019 through April 15, 2020. Movant

is entitled to an order directing the government to return and/or delete all copies of all

records that were created prior to December 1, 2019 and after April 15, 2020.

Movant is entitled to an order declaring that the magistrate incorrectly found

that probable cause existed that a violation of the DPA occurred prior to March 30, 2020,

and that there could be evidence of that violation that was created prior to March 30,

2020. Movant is entitled to an order directing the government to immediately return

and/or delete all copies of such records that were created prior to March 30, 2020.

Movant is entitled to an order declaring that the government illegally retained all

of the records that were not within the scope of the First Warrant, whether the court

determines that scope to begin on December 1, 2019 or March 30, 2020. Movant is entitled to an order that the government to immediately return and/or delete all copies of such records.

Movant is entitled to an order declaring that the warrantless searches conducted by Reich, J.M. and M.D. were government searches, subject to the warrant requirement of the Fourth Amendment and that all of the evidence obtained by the government as a result of those searches must be returned and/deleted immediately.

Moreover, Movant is entitled to an order forbidding the government from using any illegally obtained records in any Court, for any purpose.

Respectfully submitted, this the 26th day of September, 2022.

*/s/Matthew G. Mestayer*
Matthew G. Mestayer (MS Bar # 9646)

**OF COUNSEL:**
Matthew G. Mestayer (MS Bar # 9646)
REEVES & MESTAYER, PLLC
106 Main Street
P.O. Drawer 1388
Biloxi, MS 39533
(228) 374-5151
mgm@rmlawcall.com

Attorney for Gulf Coast Pharmaceuticals Plus

Defendants May Be Served At:

United States Attorney
Southern District of Mississippi
501 Court Street
Jackson, MS 39201

Hon. Merrick Garland
United States Attorney General
U.S. Department of Justice
950 Pennsylvania Ave.
Washington, D.C.
20530-0001